KAPLAN ET AL., INDIVIDUALLY AND T/A KEYSTONE
MOTORS *v.* STEIN ET UX.

[No. 20, October Term, 1951.]

*Decided November 2, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Foster H. Fanseen,* with whom were *Ginsberg and Ginsberg* on the brief, for appellants.

*Archey C. New* and *John H. Herold* for appellees.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by the owners, (Keystone), of a Buick automobile, from a judgment in favor of the appellees for damages done to a tree, while that automobile was being operated by one Emilio Capanna.

At the trial below, Emilio Capanna was joined with the appellants, Keystone, as a defendant. Capanna also filed a cross-claim against the appellants, Keystone, for damages for personal injuries. The case was tried before a jury. A judgment was entered against the appellants, Keystone, in favor of the appellees for the sum of $500.00 with interest and costs, and in favor of Emilio Capanna, the remaining defendant. An appeal is taken from that judgment by Keystone to this Court. On the cross-claim of Capanna, a judgment was entered in his favor against the appellants, Keystone, for one cent damages, and costs. If an appeal was taken from the judgment on the cross-claim, it is now abandoned.

If any error was made in the court's instruction to the jury that question is not before us, as no objections

were made as required by III. Trials, Rule 6 (c) of the General Rules of Practice and Procedure.

The question here presented is whether there was legally sufficient evidence in this case to entitle the appellees to recover against the appellants and therefore whether appellants' demurrer prayer and motion for judgment N.O.V. should have been granted. Of course, in deciding this question, we must resolve all conflicts in the evidence in favor of the appellees and assume the truth of all evidence and all inferences which may naturally and legitimately be deduced therefrom which tend to support plaintiff's claim. *Eisenhower v. Baltimore Transit Co.*, 190 Md. 528, 532, 59 A. 2d 313. We will therefore recite the evidence in a light most favorable to the appellee.

Mr. Emilio Capanna bought an automobile from the appellants sometime previous to May, 1949. Having had trouble with this car, on May 14, 1949, he brought it to appellants' place of business in Baltimore and wanted to "change" the car because it had been giving him "a lot of trouble". The appellants refused to accept the return of the car but agreed to repair it if Capanna would pay $70.00 for the necessary material. Appellants agreed to furnish the labor. The work would require about two days. Capanna told appellants that he would need a car to go to his work "far away" the next week. He could not leave his car for repairs unless he had another car. Appellants loaned him a Buick automobile on that day to use until his car was repaired. About 4 P. M. on May 14th Capanna took the car at appellants' shop and drove it from 350 Fallsway to his home on Manchester Avenue, a distance of about four or five miles. On his way home he was not required to stop once as there were no red lights against him. He did not "put on the brakes" once all the way home. He parked the car at the curb in front of his house. When asked whether he "put on" the emergency brake that night when he stopped the car, he replied: "There was

the curb there, there was no need for that" * * * "Yes, I pulled it."

Mr. Jarrett, an employee of Keystone, testified that "about two weeks or two weeks and a half" before the Buick car was loaned to Capanna, he checked the motor, "the foot brakes were all right, I checked them in the basement, checked the fluid in the car, checked the lights, the front end, underneath parts, naturally, it was an old automobile, it wasn't a new car but they were in good mechanical condition". "The emergency brake held because when I came out of the basement I have a steep incline to come out, when I back the car in there, I have to set the brake to hold it to keep from running back." After the inspection by Mr. Jarrett, the Buick was placed on the lot for sale, where all the older model cars were placed. When asked whether anybody had driven it, he replied: "Not as I know of, sir, I don't think they had."

The next morning, Sunday, May 15th, Capanna started off in the Buick automobile to discuss the next week's business with his son-in-law, who lived on Simmonds Avenue. He drove the Buick out Reisterstown Road to Rogers Avenue. At the race track he turned left and entered Simmonds Avenue which is about 35 or 40 feet in width. Automobiles were parked on both sides of the street. He started down the steep hill on Simmonds Avenue and noticed children playing below him in the middle of the street. He put his foot on the brake but he "had no brake" because the brake would not work. He immediately "got the emergency brake". This would not work and he had nothing at all with which to stop the car. He tried to blow the horn but it would not blow. He said, "I start to quiver myself, so you know I look around, you know, to find a spot to stop my car somewhere. I got to stop this car. * * * I have no brake. I said, what you going to do, I have to stop somewhere." He saw a vacant spot on the side of the street and turned the car to the right and hit the curb. He broke one front wheel in the street and the other wheel was on top

of the pavement. The car hit the tree, causing the damage for which the appellees sued. His son-in-law called the Keystone Garage but it was closed on Sunday. He then called Goldman's Garage and the Buick was towed to their place of business and arrived there on Sunday morning. Mr. Goldman, an automobile mechanic and a disinterested witness, testified that he inspected the car as soon as it arrived at his place. He said, "When I inspected the brakes, I found one front cable, that's the hydraulic brake hose, for a new car it would be something, it wasn't anything for an old car, had broken, it was a hose that had rotted and it busted through". When asked by the court the condition of the foot brake, he answered: "The foot brake, prior to the time the accident happened, was all right, but the car, due to wear, being an old car, the hose busted through, and naturally, he had no foot brake whatsoever. The emergency brake he hadn't had." He further said as to the foot brake: "Before he applied the brake they were all right, the accident had nothing to do with the foot brakes." He further said that he inspected the hose and it had rotted, and the break in the hose was due to rot. When asked if he inspected the emergency brake, he said the car had "no emergency brake at all". He said the emergency brake would not hold at all and from his inspection, it was evident that the condition of the emergency brake had existed for some length of time and it was something that an automobile mechanic could have easily seen if he inspected the car. He said: "It had not snapped off recently, in other words, he did not have an emergency brake."

Mr. Jarrett, the employee for the appellant, when asked the question: "Now you heard Mr. Goldman testify the car had no emergency brake," replied: "Yes, sir, I can't say why he could be so sure the automobile didn't have any emergency brake on the car, because when the car came back, it was so smashed up, we sold it for junk. The front wheel was off of it, the brake fluid hose was broken and stripped, and you couldn't tell whether it

was rotten or what, and the frame was bent back against the steering post in the left side, where the cable comes down from the side, where the emergency brake comes down from the side of the car, it was an old car, dirty and rusty underneath. The car was smashed up so bad, I don't see how anybody could have told the exact condition of the brakes."

From the testimony, the jury might have concluded that Capanna had no knowledge that the brakes on the Buick automobile were defective until the time of the accident in this case. From their verdict, it is evident that they did make this finding. They could have also found that he had made no inspection of the brakes. Although it was the duty of Capanna in driving this strange automobile for the first time to see that there were no obvious defects in its mechanism which were apt to cause injury to others, *Sothoron v. West,* 180 Md. 539, 544, 26 A. 2d 16, the jury found in his favor and no appeal is before us from that judgment.

In this State: "Every motor vehicle, other than a motorcycle, when operated upon a highway shall be equipped with brakes adequate to control the movement of and to stop and hold such vehicle, including two separate means of applying the brakes to at least two wheels. * * *" Code 1947 Supplement, Article 66½, Sec. 232. The appellants rely strongly on the case of *Sothoron v. West, supra.* However, that case involved an action against the driver of an automobile with defective brakes, and not against the owner and therefore is not in point here.

In *Milestone System v. Gasior,* 160 Md. 131, 152 A. 810, the defendant let for reward a passenger automobile. While this car was being used a passenger was injured by falling through a defective door of that car. In a suit for damages for the injury to the passenger this Court said at page 136: "So, if with knowledge, or an absence of knowledge because of a failure on the part of the letter to take affirmative action to examine, with care and skill, the automobile to ascertain if any defects exist

420

which make it unfit for the profitable uses to which the letter designed to put it, the letter rents an automobile with a defect, he becomes liable for any injury resulting from such defect as its proximate cause, not only to the hirer but also to any third person associated with the letter as guest, passenger, or otherwise in the use of the automobile within the contract of letting. * * * Hence, if, while an automobile is being properly used for the purpose for which it was hired, a defect in the automobile works an injury, it then becomes incumbent on the letter to show that the defect was not preventable by any care or skill on his part. This is particularly true where the defect would have been ascertained by a skillfull and careful inspection, and the defendant and not the plaintiff was in possession of the automobile until the letting, which would render it difficult for the plaintiff to prove what the defendant would know, with reference to whether or not an examination had been made and how and when, and what conditions had been found. * * * the evidence on the part of the plaintiff was legally sufficient for the jury to find that, while the automobile was being carefully used, the injury of the plaintiff was directly caused by a defective lock of the automobile, and that this condition of the lock existed at the time of the letting by reason of some cause intervening after construction, and that either the letter had notice of this condition when the automobile was delivered to the hirer or, if the defendant were actually ignorant of the defective condition of the lock when the automobile was let, this lack of information subsisted because the defendant had failed to make such an inspection as a reasonably careful and skilful person would have made under similar circumstances * * *." *Mitchell v. Lonergan,* 285 Mass. 266, 189 N. E. 39. *Vaughn v. Millington Motor Co.,* 160 Tenn. 197, 22 S. W. 2d 226. There seems to be no difference whether the loan is for hire or whether it is gratuitous. *Standard Oil Co. v. Leaverton,* 239 Mo. App. 284, 192 S. W. 2nd 681. The Restatement of the Law of Torts, Section 388 states: "One who supplies

directly or through a third person a chattel for another to use, is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied; (b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so." See Comment c to Section 388. Also Section 389 and *State for Use of Joyce v. Hatfield,* 197 Md. 249, 252-253, 78 A. 2d 754, 755; *Bock v. Truck & Tractor, Inc.,* 18 Wash. 2d 458, 139 P. 2d 706; *Jones v. Raney Chevrolet Co.,* 213 N. C. 775, 197 S. E. 757 Id., 217 N. C. 693, 9 S. E. 2d 395; *Holt v. Eastern Motor Co.,* 65 Ga. App. 502, 15 S. E. 2d 895.

The rule seems well expressed in the case of *Egan Chevrolet Co., v. Bruner, supra,* 8 Cir., 1939, 102 F. 2d 373, 375, 122 A. L. R. 987, where is said: "A retail dealer who takes a used truck in trade and undertakes to repair and recondition it for resale for use upon the public highways owes a duty to the public to use reasonable care in the making of tests for the purpose of detecting defects which would make the truck a menace to those who might use it or come in contact with it and in making the repairs necessary to render the truck reasonably safe for use upon the public highways, and is charged with knowledge of defects which are patent or discoverable in the exercise of ordinary care. * * * The rule does not mean—as the appellant seems to fear— that a dealer in used motor vehicles, who undertakes to recondition a truck for resale, becomes virtually an insurer of the safety of the truck he sells, nor does it mean that he is required to disassemble an entire truck to examine each of its parts. It does mean that he must

use reasonable care to ascertain whether the truck is equipped with the minimum essentials for safe operation, one of which unquestionably is a steering mechanism which will work and which will not shortly shake apart under normal use. One who permits a truck with a dangerously defective steering mechanism to be used upon the public highways, not only has reason to anticipate that it will cause an accident, but may be almost certain that it will do so." What was said in that case as to steering mechanism would apply equally to brakes, and certainly to a car with no emergency brakes.

Even if Capanna was negligent in not inspecting the brakes of this strange car, his negligence was merely concurrent with the alleged negligence of the appellants in not inspecting the automobile with reasonable care before loaning it to Capanna, and not such as to prevent the jury from finding that appellants' negligence was the proximate cause of the accident. There was no evidence that any operation by Capanna of the automobile caused the accident other than the failure of the brakes which the jury could have found should have been inspected and repaired by appellants before allowing the car to be used on the public highways. As was quoted from *Addison on Torts* in *United Railways Co., v. Perkins,* 152 Md. 105, at page 111, 136 A. 50, at page 53: "Whoever does an illegal act is answerable for all the consequences that ensue in the ordinary and natural course of events, though those consequences be immediately or directly brought about by the intervention of others, provided the intervening agents were set in motion by the primary wrongdoer, or provided their acts causing the damage were the necessary or legal and natural consequence of the original wrongful act." See authorities there cited. *Lashley v. Dawson,* 162 Md. 549, 562, 160 A. 738, and authorities there cited. It was said by Judge Offutt in *Holler v. Lowery,* 175 Md. 149, at page 161, 200 A. 353 at page 358: "There is no mystery in the doctrine of proximate cause. It rests upon common sense rather than legal formula. Expressed in the simplest

terms, it means that negligence is not actionable unless it, without the intervention of any independent factor, causes the harm complained of. It involves of course the idea of continuity, that the negligent act continuously extends through every event, fact, act, and occurence related to the tortious conduct of the defendant, and is itself the logical and natural cause of the injury complained of. In the statement of the doctrine an intervening cause means not a concurrent and contributing cause, but a superseding cause, which is itself the natural and logical cause of the harm." See also *Mullan v. Hacker,* 187 Md. 261, 269, 270, 49 A. 2d 640.

From the evidence in this case the jury could have found that when the appellants bought this Buick and loaned it to Capanna "it was an old car, dirty and rusty underneath"; that it had not been inspected for over two weeks before it was loaned to Capanna; that when loaned to Capanna it had no emergency brake; that the proximate cause of the accident was a break in the rotten hydraulic hose of the foot brake and the lack of an emergency brake while Capanna was driving down the hill; and that reasonable care in the inspection of this automobile, would have disclosed the lack of an emergency brake and perhaps the rotten hydraulic hose to the foot brake. Applying these facts to the principles of law as above set forth, we are of opinion that the demurrer prayer of the appellants and motion for a judgment N.O.V. were properly refused. *Flies v. Fox Bros. Buick Co.,* 196 Wis. 196, 218 N. W. 855, 60 A. L. R. 357. *Saunders System Birmingham Co. v. Adams,* 217 Ala. 621, 117 So. 72, 73, 61 A. L. R. 1333.

*Judgment affirmed, with costs.*